FILED

2021 Dec-29  PM 01:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

IRWIN HOLDINGS, LLC, *et al.*,    )
    )
      Plaintiffs,    )
    )
v.    )    Case No. 2:18-cv-00774-SGC
    )
WEIGH TO WELLNESS, LLC,    )
    )
      Defendant.    )

## MEMORANDUM OPINION[1]

Irwin Holdings, LLC, and American Family Care, Inc., commenced this action against Weigh to Wellness, LLC, asserting claims for trademark infringement under 15 U.S.C. § 1114(1)(a) and unfair competition under 15 U.S.C. § 1125(a)(1), both provisions of the Lanham Act. (Doc. 1).[2,3] In response to the complaint, the

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 11).

[2] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

[3] A trademark identifies the source of goods, while a service mark identifies the source of services. *See* 15 U.S.C. § 1127 (defining "trademark" and "service mark"); *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1260-61 (11th Cir. 2017) (discussing distinct but similar purposes of trademarks and service marks); *Univ. of Florida v. KPB, Inc.*, 89 F.3d 773, 775 n.4 (11th Cir. 1996) ("A 'service mark' is identical to a trademark in all respects except that it is intended to indicate the origin of services, rather than goods."). For the purpose of this memorandum opinion, the court adopts the plaintiffs' terminology and refers to the § 1114(1)(a) claim as one for trademark infringement. The analysis of an infringement claim is usually the same whether it relates to a trademark or a service mark. *See Tana v. Dantanna's*, 611 F.3d 767, 772 n.3 (11th Cir. 2010) ("The analysis is the same for service mark and trademark infringement."); *Savannah Coll. of Art & Design*, 872 F.3d at 1261 ("In most respects, the analysis

defendant filed a motion seeking dismissal under Rule 12(b)(6) of the *Federal Rules of Civil Procedure* or, alternatively, summary judgment under Rule 56 of those rules. (Doc. 8).   As grounds for the motion, the defendant argued the plaintiffs' claims were barred by the doctrine of laches and, alternatively, that it was entitled to summary judgment based on its status as a prior user under 15 U.S.C. §§ 1057(c)(1) and 1115(b)(5).  (*Id.*).  By a memorandum opinion and order dated August 15, 2019, the court denied the defendant's motion, holding the defendant had failed to establish either a laches defense or a statutory prior user defense.  (Doc. 19).   Now pending is the defendant's renewed motion for summary judgment, filed after an unsuccessful attempt at mediation and a period of discovery.  (Docs. 18, 23, 27, 37).   In the renewed motion, the defendant reasserts its laches and statutory prior user defenses and additionally argues the plaintiffs cannot carry their burden of demonstrating a likelihood of confusion between the marks at issue.  (Doc. 37).   For the reasons discussed below, the defendant's motion (Doc. 37) is due to be granted on the basis of its third argument, and this action is due to be dismissed with prejudice.

---

is the same [for trademarks and service marks] and courts thus treat the two terms as interchangeable in adjudicating infringement claims.") (internal quotation marks omitted).

## I.      Facts[4]

American Family Care is a national network of medical clinics that provides primary, family, urgent, occupational, and outpatient care.  (Doc. 1 at ¶ 10). Additionally, it offers a medically-supervised weight loss program called "Weigh To Live" (the "WTL program") primarily at four of its facilities located in the Birmingham, Alabama area.  (Doc. 1 at ¶ 10; Doc. 37-2 at pp. 18-19, 28).  Irwin Holdings filed an application for registration of the mark "Weigh To Live" (the "WTL mark" or the "plaintiffs' mark") on March 16, 2015, and obtained registration of the mark on June 14, 2016.  (Doc. 1-1; Doc. 1-3 at pp. 5-7; Doc. 37-4).  It licenses the WTL mark to American Family Care.  (Doc. 1 at ¶ 11).  While the application for registration of the WTL mark and the certificate of registration for the mark identify February 1, 2014, as the mark's date of first use, the plaintiffs now assert American Family Care began using the mark in 2010.  (Doc. 1-1; Doc. 1-3 at p. 6; Doc. 37-4; Doc. 38 at p. 2).

Randy Johansen, President of American Family Care, offered testimony regarding a variety of ways in which American Family Care advertised its weight loss program using the WTL mark between 2010 and 2012 or at some other

---

[4] The following facts are undisputed, unless otherwise noted.  They are viewed in the light most favorable to the plaintiffs, as the non-movants, with the plaintiffs given the benefit of all reasonable inferences.  Facts identified by the parties are not included in this section if immaterial to the disposition of the pending motion.

unspecified time in the past.  (Doc. 37-2 at pp. 30-31, 39-43, 45-47, 57-58, 66-67; *see also* Doc. 37-5; Doc. 37-6).[5]  Johansen testified that in the past two years American Family Care might have advertised the program through direct mailings but that it presently does not do so.  (Doc. 37-2 at pp. 44-45).  He further testified American Family Care currently does not advertise the program on television, on the radio, or in publications; it has never advertised the program through exterior signage at its clinics; and he does not know whether the program ever was advertised on a social media platform.  (Doc. 37-2 at pp. 44-45, 53-54, 57, 173).  According to Johansen, from 2016 to the present, American Family Care primarily has advertised the program through promotional materials (e.g., brochures, posters) displayed in its clinics and through search engine optimization.   (Doc. 37-2 at pp. 172-173).[6] However, Johansen acknowledged the website created for the program – www.weightolive.net – is inactive and testified he does not know when or why that happened.  (Doc. 37-2 at p. 50).  He also testified he "guess[es]" but does not know

---

[5] While this testimony referenced a television advertisement, communications related to the advertisement suggest the advertisement was produced in 2013.  (Doc. 37-7).  There is some question whether it ever aired.  (Doc. 37-2 at pp. 43-44).

[6] Search engine optimization "basically means taking steps to ensure that your website is shown first, or as close to first as possible, when the topic of your website is searched for on an internet search engine such as Google or Yahoo!."  *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 456 n.5 (E.D.N.Y. 2011) (internal quotation marks omitted).  "The 'higher' a website appears within a list of search results, the more likely it is that visitors will land at that website via a particular search engine."  *Id.* (internal quotation marks omitted).

whether the program is referenced on American Family Care's main website.  (Doc. 37-2 at pp. 49-50).

The defendant, owned by Leslie Ellison, offers a medically-supervised weight loss program called "Weigh To Wellness" (the "WTW mark," the "defendant's mark," or the "WTW program") from a single facility in the same Birmingham, Alabama market where several American Family Care clinics offering the WTL program are located.  (Doc. 1 at ¶¶ 15-17; Doc. 1-1 at ¶ 3; Doc. 8-1 at ¶ 2; Doc. 37-1 at p. 63; Doc. 37-2 at pp. 17-19).  Signage bearing the WTW mark is displayed on the exterior of the facility.  (Doc. 8-1 at ¶¶ 9-10; Doc. 8-7 at p. 3; Doc. 8-8 at p. 4).  Ellison conceived of the name "Weigh to Wellness" in December 2013 and selected that particular name because it was "catchy" and described what her business did.  (Doc. 37-1 at pp. 48-49).  She formed the defendant in January 2014 and took other preparatory steps for doing business between that time and June 2014, when the first patient was seen.  (Doc. 8-1 at ¶¶ 4-14; Doc. 8-4 at pp. 3-7; Doc. 37-1 at pp. 58-59, 62).  The defendant advertises its program in community publications and through social media accounts and radio endorsements.  (Doc. 8-1 at ¶¶ 14-15; Doc. 8-11; Doc. 8-12; Doc. 37-1 at p. 66).   It also has an online presence at www.weightowellnessllc.com and www.weightowellnessbham.com and distributes business cards and promotional goods (e.g., pens, water bottles, bags) bearing the WTW mark.  (Doc. 8-1 at ¶¶ 5, 11-12; Doc. 8-9 at p. 5).  The defendant spent

$677,015.00 marketing its services from 2014 through 2019.  (Doc. 37-10).  Ellison had no awareness of the weight loss program offered by American Family Care until she received a cease-and-desist letter from the plaintiffs dated June 2, 2015, asserting the WTW mark infringed the WTL mark.  (Doc. 1-3; Doc. 8-1 at ¶ 16; Doc. 37-1 at pp. 68-69).

The defendant has produced evidence the United States Patent and Trademark Office (the "USPTO") has registered on a nationwide basis at least 51 other marks for weight management services and products that substitute the homophone "weigh" for "way," 11 of which additionally include the preposition "to" or its numeric homophone.  (Doc. 37-9).  Additionally, Ellison testified that at some point she unsuccessfully sought to purchase a domain name from a Colorado-based company offering weight management services under the name "Weigh 2 Wellness."  (Doc. 37-1 at pp. 51-52).  The defendant also provided the web addresses for four entities other than American Family Care that use or have used the phrase "Weigh to Live" on an unregistered basis in connection with weight management services.  (Doc. 37 at pp. 25-26 n.6).

Both Ellison and Johansen testified they are not aware of any member of the relevant public ever having confused the plaintiffs' mark and the defendant's mark.  (Doc. 37-1 at pp. 68-69; Doc. 37-2 at pp. 118-20).  Moreover, in their written

discovery responses, the plaintiffs indicated they had no evidence of any such confusion.  (Doc. 37-8 at pp. 8, 11).

## II.    Standard of Review

Under Rule 56, "[t]he [district] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The party seeking summary judgment bears the initial burden of informing the district court of the basis for its motion and identifying those portions of the record the party believes demonstrate the absence of a genuine dispute as to a material fact.  *Celotex Corp.*, 477 U.S. at 323.  If the moving party carries its initial burden, the non-movant must go beyond the pleadings and come forward with evidence showing there is a genuine dispute as to a material fact for trial.  *Id.* at 324.

The substantive law identifies which facts are material and which are irrelevant.  *Anderson*, 477 U.S. at 248.  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-movant.  *Id.* at 248.  If the evidence is merely colorable or not significantly probative, summary judgment is appropriate.  *Id.* at 249-50 (internal citations omitted).  All reasonable doubts about the facts should be resolved in favor of the non-movant, and all justifiable inferences

should be drawn in the non-movant's favor.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III.   Discussion

### A.   Reassertion of Laches & Prior User Defenses

As stated, it its initial dispositive motion, the defendant asserted a laches defense and a statutory prior user defense.  (Doc. 8).  The court held the defendant had not produced sufficient evidence to establish either defense.  (Doc. 19).  Armed with additional evidence, the defendant reasserts these defenses in its renewed motion for summary judgment.  (Doc. 37).  Because, as discussed below, the plaintiffs have not carried their burden of demonstrating a likelihood of confusion between the parties' marks, it is not necessary to address the merits of the defenses reasserted by the defendant.  Nonetheless, the court does address the defendant's statutory prior user defense in the abstract to rectify an analytical error in the August 15, 2019 memorandum opinion and order.

The act of filing an application for registration of a trademark or service mark constitutes constructive use contingent on final registration and confers a nationwide right of priority on the registrant dating back to the application date.  *See* 15 U.S.C. §§ 1057(b) and (c), 1115(a).  The rights of a registrant are, however, subject to several defenses.  *Peaches Ent. Corp. v. Ent. Repertoire Assocs.*, 62 F. 3d 690, 692 (5th Cir. 1995).  One of those is the defense codified at 15 U.S.C. § 1115(b)(5),

referred to as the "prior user" or "prior use" defense or the "limited area exception." *Id.* at 692-93.[7]  This defense aids a party who "adopted [a mark] without knowledge of the registrant's prior use" and has made "continuous[] use[]" of the mark "from a date prior to [] the date of constructive use of the mark established pursuant to section 1057(c)."  *See* § 1115(b)(5); *see also* 15 U.S.C. § 1057(c)(1) (providing right of priority conferred by registration does not apply against party who made actual use of the mark prior to registrant's constructive use).  The defense applies "only for the area in which such continuous prior use is proved."  § 1115(b)(5).

In its initial dispositive motion, the defendant asserted a statutory prior user defense on the basis it made actual use of its mark before the plaintiffs applied for registration of their mark.  (Doc. 8 at pp. 9-14; Doc. 17 at pp. 7-9).  In response, the plaintiffs argued the question was not whether the defendant made actual use of its mark before the plaintiffs applied for registration of their mark but, rather, which party first used its mark in commerce.  (Doc. 16 at pp. 6-9).  Although the undersigned ultimately did not reject the defendant's statutory prior user defense on the basis of the plaintiffs' argument, the undersigned did note the plaintiffs' argument did not fail as a legal premise because a party can establish priority through

---

[7] Although the defense is codified in a statutory subsection addressing incontestable marks, it may be asserted against a contestable mark, as well.  *See* § 1115(a); *see also* 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:51 (5th ed.) (noting November 16, 1989 amendment to Lanham Act that clarified availability of defense against contestable marks).

registration *or* actual use. (Doc. 19 at pp. 16-18). In other words, the court accepted the plaintiffs' argument in theory.

The undersigned has laid fresh eyes on the parties' arguments, reiterated in their briefing of the defendant's renewed motion for summary judgment, and reconsidered those arguments in the context of the applicable statutory framework and interpretive case law. Consequently, it is clear the plaintiffs' insistence the question is which party can establish priority of actual use is a red herring. While it is true a party can establish priority through registration or actual use, that is not the question for purposes of analyzing a statutory prior user defense. Section 1115(b)(5) assumes the party claiming infringement made actual use of its mark before the alleged infringer made actual use of its mark. The question for purposes of § 1115(b)(5) is in fact whether the alleged infringer made actual use of its mark before the party claiming infringement applied for registration of its mark. If so, and assuming the use is innocent and continuous within the meaning of § 1115(b)(5), the statutory prior user defense applies. As the defendant correctly notes, § 1115(b)(5) expressly aids an "intermediate junior user" – a party whose actual use of a mark post-dates a registrant's actual use of a mark but pre-dates the registrant's constructive use of the mark. *See* 5 MCCARTHY § 26:44 (discussing § 1115(b)(5) prior use defense); *Peaches Ent. Corp.*, 62 F.3d at 692-93 (same); *Champions Golf*

*Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir. 1996) (same).

The defendant's briefing of its statutory prior user defense also raises the question whether the distraction created by the plaintiffs' red herring led the court to analyze the "use" sufficient to invoke the defense incorrectly. The undersigned asked whether the defendant had demonstrated use sufficient to establish common law ownership but technically should have asked whether the defendant had demonstrated continuous use within the meaning of § 1115(b)(5). (Doc. 19 at pp. 18-23). Nonetheless, it is doubtful application of the latter analysis would have yielded a different result. In support of its initial dispositive motion, the defendant submitted only evidence it used its mark in connection with preparatory steps for doing business; as part of early promotional efforts, without specifics regarding the magnitude, public reach, or efficacy of those efforts; and on products such as meal replacements and protein supplements it sold to the public, without any indication as to the quantity of sales. (*See generally* Doc. 8-1). Courts generally look for something more, whether analyzing the use element of common law ownership or the continuous use element of a statutory prior user defense. *Compare Maritec Indus., Inc. v. Sterling Powerboats, Inc.*, 2004 WL 3403353, at *3 (M.D. Fla. Nov. 16, 2004) (noting priority rights in a mark are not established by using the mark in preliminary steps to launch a business), *FN Herstal SA v. Clyde Armory Inc.*, 838

F.3d 1071, 1081 (11th Cir. 2016) (noting advertising, publicity, and solicitation can demonstrate prior use in commerce *if* they have a substantial impact on the purchasing public), *and Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1196 n.11 (11th Cir. 2001) (noting courts routinely have found evidence of a few sales of goods bearing a mark insufficient to establish ownership of the mark), *with Peaches Ent. Corp.*, 62 F.3d at 693 (noting intermediate junior user's trade territory is comprised of the areas where it has significant sales at the time of the senior user's registration and that advertising alone cannot establish the intermediate junior user's trademark rights in an area), *Thrifty Rent-A-Car Sys., Inc. v. Thrift Cars, Inc.*, 831 F.2d 1177, 1182 (1st Cir. 1987) (noting continuous use within the meaning of § 1115(b)(5) is dependent on a threshold level of geographical market penetration and holding limited advertising and sporadic rentals were not sufficient to establish defendant's continued and actual market presence in a particular area for purposes of § 1115(b)(5)), *All Video, Inc. v. Hollywood Ent. Corp.*, 929 F. Supp. 262, 266-67 (E.D. Mich. 1996) (noting that to establish trade area for purposes of § 1115(b)(5) there must be sufficient sales activity to show substantial numbers of people in the area associate a mark with a particular source and finding advertising undertaken by plaintiff was of limited usefulness in establishing plaintiff's trade area for purposes of § 1115(b)(5) without evidence concerning effects of advertising on the market), *and Modular Cinemas of America, Inc. v. Mini Cinemas Corp.*, 348 F. Supp. 578,

582 (S.D.N.Y. 1972) (holding that neither incorporation nor mere advertisement demonstrated use sufficient to establish statutory prior user defense because trademark rights are not acquired through adoption or intention to use but, rather, through actual use in trade).

Whether the record now contains sufficient evidence to find the defendant has made continuous use of its mark from a date prior to registration of the plaintiffs' mark is a question the undersigned declines to answer because, as discussed below, the claims against which the defendant asserts a statutory prior user defense (and, for that matter, a laches defense) fail as a matter of law.[8]

---

[8] The undersigned also notes there is some question whether a party asserting a statutory prior user defense must, in addition to the elements discussed above, prove it was using its mark in a "remote" area.  *Compare* 5 MCCARTHY § 26:48 (noting § 1115(b)(5) could be viewed as a codification or restatement of the common law *Tea Rose-Rectanus* doctrine, which provides that the senior user of an unregistered mark cannot stop the good faith use of a junior user in an area where the senior user's goods or services are not sold and urging that courts should not read the statutory defense as dispensing with the remoteness requirement), *Peaches Ent. Corp. v. Ent. Repertoire Assocs., Inc.*, 1993 WL 534016, at *1 n.1 (E.D. La. Dec. 13, 1993) (explaining the defense provided by § 1115(b)(5) "is that a senior user of a mark is not permitted to oust a geographically-remote good faith junior user, who used the mark prior [to] issuance of the registration of the mark to the senior user in a separate market" and that "[t]he junior user has the burden of pleading and proving . . . remoteness . . . ."), *aff'd in part, modified in part, and remanded*, 62 F.3d 690 (5th Cir.1995), *and Champions Golf Club*, 78 F.3d at 1124 (implying remoteness is an element of the statutory prior user defense by instructing district court to determine whether plaintiff's mark had achieved nationwide recognition at time defendant began using mark because, if so, defendant could not be an innocent junior user), *with Quicksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 761-62 (9th Cir. 2006) (holding remoteness is not an element of a § 1115(b)(5) defense simply because the text of the statute does not contain a remoteness element), *and Emergency One, Inc. v. Am. Fire and Eagle Engine Co.*, 332 F.3d 264, 272 n.4 (4th Cir. 2003) (noting statutory prior user defense and common law *Tea-Rose Rectanus* doctrine are not identical to the extent the former "appears to have eliminated 'remoteness' as a requirement for the defense").  Neither party addresses this issue.

**B.     Likelihood-of-Confusion Analysis**

To prevail on a claim of infringement of a registered mark under § 1114(1)(a) or unfair competition under § 1125(a)(1), a plaintiff must show (1) its mark has priority of use and (2) the defendant's mark is likely to cause consumer confusion as to the source of the goods or services represented.  *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) (reciting elements of § 1114(1)(a) claim); *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001) (reciting elements of § 1125(a)(1) claim); *Florida Int'l Univ. Bd. of Trs. v. Florida Nat'l Univ., Inc.*, 91 F. Supp. 3d 1265, 1284-85 (S.D. Fla. 2015) (noting the legal standards for unfair competition and trademark infringement under the Lanham Act are essentially the same), *aff'd*, 830 F.3d 1242, 1255 (11th Cir. 2016).  Courts in the Eleventh Circuit employ the same seven-factor balancing test to assess the likelihood-of-confusion element of trademark infringement and unfair competition claims.  *Florida Int'l Univ. Bd. of Trs.*, 91 F. Supp. 3d at 1285.  The seven factors are (1) the strength of the allegedly infringed mark; (2) the similarity of the alleged infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the

14

existence and extent of actual confusion in the consuming public. *Florida Int'l Univ. Bd. of Trs.*, 830 F.3d at 1255.

Evaluation of the factors, which are "interrelated in effect," requires more than the "mechanistic summation of the number of factors on each side." *Custom Mfg. and Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 649-50 (11th Cir. 2007). A court must determine the weight that should be accorded to each factor based on the unique facts of a case and decide where the "overall balance" lies. *Id.* at 649-50. The "bottom line" is always whether confusion among the purchasing public is probable, not merely possible. *Id.* at 649, 651. Moreover, while the likelihood of confusion is a question of fact, the Eleventh Circuit "has routinely 'weighed' the likelihood-of-confusion factors on summary judgment" and decided the question as a matter of law. *Tana*, 611 F.3d at 776 n.7.

### 1. Strength of WTL Mark

Although, as stated, the weight accorded to each factor in the seven-factor balancing test is determined on a case-by-case basis, the strength of the allegedly infringed mark (the first factor) and the existence and extent of actual confusion (the seventh factor) generally are regarded as the most important factors, in ascending order of importance. *Florida Int'l Univ. Bd. of Trs.*, 830 F.3d at 1255-56. The protection afforded a mark increases with its strength. *Id.* at 1256. The strength of a mark is determined by first classifying the mark as "generic," "descriptive,"

"suggestive," or "arbitrary," in ascending order of strength, based on the relationship between the mark and the goods or services it describes. *Id.* at 1256-67.

Classification on the spectrum of distinctiveness is not conclusive of strength. After classifying a mark, a court considers the degree to which third parties use the mark. *Id.* The more that third parties use the mark, the weaker the mark is and the less protection it is afforded. *Id.* While "the number of third-party users is important, [] there is no hard-and-fast rule establishing a single number that suffices to weaken a mark." *Id.* Moreover, the number of third-party users is not the only relevant consideration. *Id.* Courts also consider the entire name a third-party uses and the type of business in which the third party is engaged. *Id.*

The plaintiffs do not argue their mark is arbitrary, and the defendant does not argue the plaintiffs' mark is generic. The dispute – to the extent there is one – is whether the plaintiffs' mark is descriptive or suggestive.[9] Descriptive marks describe the characteristics of goods or services, while suggestive marks suggest the characteristics of goods or services and "require imaginative effort by the consumer in order to be understood as descriptive." *Florida Int'l Univ. Bd. of Trs.*, 830 F.3d at 1256. The Eleventh Circuit has described the border between these two classifications as "hazy." *Engineered Tax Servs., Inc. v. Scarpello Consulting, Inc.*,

---

[9] The defendant seems to take the position the mark is descriptive but concedes the mark may be suggestive. (Doc. 37 at p. 23).

958 F.3d 1323, 1328 (11th Cir. 2020).  It employs two legal tests – the "imagination" test and the "third-party need" test – to distinguish descriptive marks from suggestive marks.  *Id.* at 1329.[10]

The imagination test asks whether "the customer who observes the term can readily perceive the nature of plaintiff's services, without having to exercise his imagination."  *Id.* (internal quotation marks and emphasis omitted).  If no imagination is needed, the mark is merely descriptive. *Id.*  Relative to the imagination test, the Eleventh Circuit has noted both federal courts and the USPTO's Trademark Trial and Appeals Board (the "TTAB") have "long recognized" a double meaning can render a mark suggestive. *Id.* at 1330, 1331 n.11. (holding a reasonable jury could find the mark "Engineered Tax Services" is suggestive of specialized tax services because it "entails a clever double meaning, referring to tax services that are performed *both* (1) skillfully and scientifically *and* (2) by actual engineers").[11]

_____

[10] The "third-party need" test is also referred to as the "third-party use" test.  *See Engineered Tax Servs.*, 958 F.3d at 1329, 1331.  The undersigned employs the former designation to distinguish the test from the third-party use analyzed at the second step of the strength analysis.

[11] *See also In re Michael W. Arlen*, 2012 WL 2024457, at *5 (T.T.A.B. May 25, 2012) (holding the marks "Instant Newtrition" and "Newtricious" are suggestive of powdered nutritional supplement mixes because they entail "a dual meaning; that of the nutritious content of the goods sold by applicant and something new or novel in the world of food supplements"); *In Re Tea & Sympathy, Inc.*, 88 U.S.P.Q.2d 1062, at *2 (T.T.A.B. 2008) (holding the mark "The Farmacy" is suggestive of retail store services featuring natural herbs, organic products, and the provision of related health information because it "conveys a dual meaning, that of the natural aspect of the goods sold by applicant and of a pharmacy"); *In re National Tea Co.*, 144 U.S.P.Q. 286, at *2 (T.T.A.B. 1965) (holding the mark "No Bones About It" has a double connotation as applied to boneless hams and, therefore, was not merely descriptive).

The third-party need test asks whether "competitors would be likely to need the terms used in the trademark in describing their product." *Id.* at 1331 (internal quotation marks omitted). "If a competitor needs the mark to describe its own product, the reasoning goes, it must not be distinctive of the mark holder's product." *Id.* (internal quotation marks omitted and alteration adopted).

Applying the foregoing tests, the undersigned readily concludes the plaintiffs' mark is suggestive, as opposed to merely descriptive. The mark replaces a word in the phrase "way to live" with a homophone to convey the idea of a weight loss program that leads to a better life. Although the word "weigh" arguably describes an element of services offered by American Family Care and may be needed by competitors to describe their services, its clever-enough use in a phrase that requires some imaginative effort to be understood as descriptive of the services represented nudges the mark as a whole past the line of demarcation between descriptive and suggestive on the spectrum of distinctiveness.

The defendant argues that even if the plaintiffs' mark is suggestive its relative strength is diminished by the degree to which third parties providing weight management services have conceived of the same or a similar play on words to suggest those services. (Doc. 37 at pp. 24-25).[12] The undersigned agrees. The

---

[12] The defendant suggests the third-party registrations carry additional significance to the extent that before a mark is registered the USPTO must conduct a search of its records and determine the mark is not likely to be confused with existing registrations for the same or similar services. (Doc.

defendant has identified 56 entities other than the parties that thought to play on the word "way" to suggest weight management services.  (Doc. 37 at pp. 25-26 n.6; Doc. 37-1 at pp. 51-52; Doc. 37-9).  Sixteen of those entities incorporated the preposition "to" or its numeric homophone into their play on words, and five conceived of a play on words identical to the plaintiffs' play on words.  If the plaintiffs' mark was truly distinctive, it is unlikely so many other businesses offering weight management

---

37 at pp. 24-25).  In other words, the defendant suggests this district court should consider that by registering numerous marks employing the same play on "way" or "way to" for weight management services (including a mark identical to the defendant's mark, registered by an entity other than the defendant in 2009), the USPTO determined those marks were not likely to be confused with one another.  (Doc. 37 at pp. 24-25).  Courts have taken varying approaches to the deference or weight given USPTO determinations, with some courts declining to give such determinations any deference or weight at all.  *See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 220-21 (3d Cir. 2000) (discussing varying approaches and holding that in the Third Circuit an initial USPTO determination by an examining attorney may be considered, but it need not be given weight when the examining attorney did not review all the evidence available to the district court); *Pilot Corp. of America v. Fisher-Price, Inc.*, 501 F. Supp. 2d 292, 302-03 (D. Conn. 2007) (holding approval of defendant's mark for publication and likely registration meant USPTO had determined use of mark was not likely to cause confusion and was entitled to great weight); *Tecumseh Poultry LLC v. Perdue Holdings, Inc.*, 2012 WL 3018255, at *8-9 (D. Neb. July 24, 2012) (considering registration of defendant's mark as prima facie evidence that it was dissimilar from plaintiff's registered marks, while at the same time casting doubt on continued viability of presumption); *Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 934 (6th Cir. 1999) (rejecting claim registration of allegedly infringing mark creates inference USPTO examining attorney found mark did not infringe earlier-registered mark), *rev'd on other grounds*, 532 U.S. 23 (2001); *Dixie Consumer Prod., LLC v. Huhtamaki Americas, Inc.*, 691 F. Supp. 2d 1372, 1376 n.2 (N.D. Ga. 2010) (noting there was no binding authority that required court to give any deference to USPTO's registration decision); *Rice v. Brand Imports, L.L.C.*, 2010 WL 11549769, at *3 (N.D. Ga. Sept. 16, 2010) (rejecting argument USPTO's decision to publish alleged infringing mark for opposition, thereby indicating it found no likelihood of confusion between alleged infringed and infringing marks, was entitled to deference).  Given this variation, and because the plaintiffs' claims fail regardless, the undersigned declines to address the defendant's suggestion regarding the additional significance of the third-party registrations.

services independently would have thought of using the same or a similar play on words. Accordingly, the third-party evidence produced by the defendant serves to diminish the linguistic uniqueness and, consequently, conceptual strength of the plaintiffs' mark. *See Combe Inc. v. Dr. Aug. Wolff GmBH & Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 448-49, 449 n.11, 452 n.14 (E.D. Va. 2019) (holding evidence of 66 third-party marks containing same prefix as plaintiff's mark was sufficient to weaken that mark's conceptual strength), *aff'd*, 851 F. App'x 357 (4th Cir. 2021).[13]

---

[13] The undersigned emphasizes this finding relates to the conceptual, as opposed to commercial, strength of the plaintiffs' mark. Conceptual strength turns on the linguistic or graphical uniqueness of a mark, considered in relation to the goods or services to which the mark attaches. *Combe*, 382 F. Supp. 2d at 452 n.14; *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006). Commercial strength, by contrast, turns on whether consumers in fact associate a mark with a particular source. *Combe*, 382 F. Supp. 3d at 452 n.14; *CareFirst*, 434 F.3d at 269. The mere fact that other businesses independently thought to use the same or a similar mark shows the mark is not unique and, therefore, lacks conceptual strength. *Combe*, 382 F. Supp. 3d at 449, 452 n.14; *CareFirst*, 434 F.3d at 270; *see also* 2 MCCARTHY § 11:90 ("A real evidentiary value of third party registrations per se is to show the sense in which a term, word, prefix or suffix of a mark is used in ordinary parlance" and whether some segment of a mark "has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that that segment is relatively weak."); *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millenium Sports, S.L.U.*, 797 F.3d 1363, 1373-74 (Fed. Cir. 2015) (holding TTAB erred by discounting evidentiary value of third-party registrations because evidence of registrations is "powerful on its face," even where the specific extent and impact of the usage of the registered marks has not been established); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 1339 (Fed. Cir. 2015) (same). However, something more than the mere existence of similar third-party marks – actual use of those marks sufficient to show consumers may not associate the plaintiff's mark with a particular source or that consumers "may have learned to carefully pick out one [mark] from the other" – is required to show a plaintiff's mark lacks commercial strength. *Combe*, 382 F. Supp. 3d at 452, 452 n.14 (holding same evidence that demonstrated lack of conceptual strength did not, standing alone, demonstrate lack of commercial strength); 2 MCCARTHY § 11:85. The defendant offers relatively little evidence regarding actual third-party use and no evidence regarding the actual use of the marks identified by the third-party registrations. In fact, it appears more than half

In sum, the court finds that while the plaintiffs' mark is suggestive, much of the strength that would have been afforded the mark by this categorization is tempered by the evidence of numerous third parties that have conceived of the same or a similar play on words to connote weight management services.  On the whole, the WTL mark is relatively weak, and the first factor does not weigh in favor of the plaintiffs.  *See Florida Int'l Univ. Bd. of Trs.*, 830 F.3d at 1258 (upholding district court's determination plaintiff's incontestable mark was relatively weak in light of 12 third parties that used all or a portion of the mark); *El Chico, Inc. v. El Chico Cafe*, 214 F.2d 721, 725 (5th Cir. 1954) (holding plaintiff's arbitrary mark was weak in light of 27 registrations for marks that included all or a portion of the plaintiff's mark); *CareFirst of Maryland*, 434 F.3d at 270-71, 274 (holding first factor weighed heavily against plaintiff because while plaintiff's mark may have been suggestive, evidence of substantial third-party use demonstrated mark was not conceptually or commercially strong).

### 2.    Similarity of WTL and WTW Marks

The second factor measures the similarity between the alleged infringed and infringing marks.  *Florida Int'l Univ. Bd. of Trs.*, 830 F.3d at 1260.  The greater the

---

of the third-party registrations have been cancelled.  The cancelled registrations remain relevant to the conceptual strength analysis, *see Combe Inc.*, 382 F. Supp. 2d at 449 n.11 (noting courts have recognized expired and cancelled registrations are relevant to show the inherent indistinctiveness of a senior mark), but they underscore the absence of evidence regarding actual use of the marks identified by the third-party registrations.

similarity, the greater the likelihood of confusion. *Id.* The marks need not be identical to support a finding confusion is likely, but rather, "the key question remains whether the marks are sufficiently similar to deceive the public." *Id.* (internal quotation marks omitted). In assessing similarity, a court "consider[s] the overall impression created by the marks, and do[es] not simply compare isolated features." *Id.* "Relevant points of comparison include the appearance, sound and meaning of the marks, as well as the manner in which the marks are used." *Id.* (internal quotation marks omitted).

The plaintiffs argue the parties' marks are confusingly similar because they employ the same play on words. (Doc. 38 at p. 9). The defendant argues the parties' marks are not confusingly similar because the terminal words of the marks differ. (Doc. 37 at p. 26). The marks indeed are similar to the extent each employs a homophone of "way," which together with the preposition "to" and a third word, conveys the idea of a weight loss program that leads to good health. Moreover, the fact that the terminal words of the marks differ does not in and of itself tip the scales in favor of the defendant. *See Florida Int'l Univ. Bd. of Trs.*, 830 F.3d at 1260 (noting two marks need not be identical to support a finding confusion is likely).[14]

---

[14] The undersigned acknowledges evidence of third-party use may be relevant to analyzing similarity to the extent that "[i]f a trademark operates in a crowded field of similar marks on similar goods or services, slight differences in names may be meaningful because consumers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." *Florida Int'l Univ. Bd. of Trs., Inc.*, 830 F.3d at 1260 (internal quotation marks

A more analytical comparison of those words in the context in which they appear does reveal meaningful distinctions between the marks. The terminal words, and consequently the marks in totality, are visually distinct to the extent the eye easily perceives that "wellness" contains more letters than "live." The double "l"s and double "s"s that appear in "wellness" enhance the visual distinctness of the word, and therefore the defendant's mark as a whole, when compared with "live" as it appears in the plaintiffs' mark. In addition to containing visual distinctions, the marks are aurally distinct to the extent the defendant's mark is alliterative while the plaintiffs' mark does not employ an auditory rhetorical device. Notwithstanding these visual and aural distinctions, the undersigned cannot conclude it would be impossible for a reasonable jury to find the parties' marks create the same overall impression. Accordingly, the second factor weighs in favor of the plaintiffs. However, the undersigned gives this factor less weight in the overall analysis given the meaningful distinctions discussed above. *See Sovereign Mil. Hospitaller Ord. of Saint John of Jerusalem of Rhodes & of Malta v. Florida Priory of the Knights Hospitallers of the Sovereign Ord. of Saint John of Jerusalem, Knights of Malta, The*

---

omitted). In this context, the appropriate focus is on actual use of a mark by third parties in the marketplace, as opposed to use in the conceptual sense. Because the defendant has not presented evidence of extensive actual third-party use of marks similar to the plaintiffs' mark, there is no basis on which to determine consumers have learned to distinguish between slight variations of the marks.

*Ecumenical Ord.*, 809 F.3d 1171, 1187 (11th Cir. 2015) (holding second factor did not meaningfully tip scales one way or the other because there were both similarities and differences between the marks); *In re Coors Brewing Co.*, 343 F.3d 1340, 1344 (Fed. Cir. 2003) (holding that "[b]ecause there are significant differences in the design of the two marks, the finding of similarity is a less important factor in establishing a likelihood of confusion than it would be if the two marks had been identical in design or nearly indistinguishable to a casual observer").

### 3. Similarity of Services

The third factor asks whether the parties' services "are the kind that the public attributes to a single source." *Florida Int'l Univ. Bd. of Trs.*, 830 F.3d at 1261 (internal quotation marks omitted). "The test is not whether the products can be readily distinguished, but rather whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." *Id.* (internal quotation marks omitted). "The focus is on the reasonable belief of the average consumer as to what the likely source of the goods is." *Id.* (internal quotation marks omitted and alteration adopted). American Family Care and the defendant both offer medically-supervised weight loss programs. The average consumer could reasonably attribute these services to a single source, and the defendant does not argue otherwise. (Doc. 37 at 26). Accordingly, the third factor weighs in favor of the plaintiffs. *See Florida Int'l Univ. Bd. of Trs.*, 830 F.3d

at 1261 (accepting district court's determination third factor weighed in favor of plaintiff where parties offered overlapping bachelor's and master's degree programs); *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1361 (11th Cir. 2007) (holding third factor weighed in favor of plaintiff where both parties provided welding services for maintaining equipment used in heavy industry).

### 4.     Similarity of Trade Channels and Customers

The fourth factor asks "where, how, and to whom the parties' products are sold." *Florida Int'l Univ. Bd. of Trs.*, 830 F.3d at 1261. "Dissimilarities between the manner of sale and the typical customers of the parties' services lessen the possibility of confusion." *Id.* "Direct competition between the parties is not required for this factor to weigh in favor of a likelihood of confusion." *Id.* "That is, the parties' outlets and customer bases need not be identical, but some degree of overlap should be present for this factor to support a finding of likelihood of confusion." *Id.*

Both American Family Care and the defendant offer weight loss services to Birmingham-area residents.  However, American Family Care's program is one of a number of services offered at particular American Family Care-branded medical clinics, while the defendant's program is offered at its standalone facility identified by signage bearing its mark and dedicated to that program only.  While the parties'

customers may be similar in a general sense,[15] it is not likely that given the distinctions between the parties' facilities those customers would walk into the defendant's facility and mistake it as offering weight management services sponsored by American Family Care.  On the whole, the fourth factor does not weigh in favor of the plaintiff.  *See Florida Int'l Univ. Bd. of Trs., Inc.*, 830 F.3d at 1262 (holding the district court reasonably concluded potential students were unlikely to confuse a Florida National University single-building campus for a Florida International University "metropolis"); *HBP, Inc. v. American Marine Holdings, Inc.*, 290 F. Supp. 2d 1320, 1335-36 (N.D. Fla. 2003) (holding fourth factor weighed against finding a likelihood of confusion where defendant's boats were sold only through its authorized dealers while plaintiff's goods and services were offered at or around its track facilities or at general retail stores), *aff'd*, 129 F. App'x 601 (11th Cir. 2005).

---

[15] While in its initial brief the defendant concedes the parties have similar customers, in its reply brief the defendant argues the parties' customers are distinct because American Family Care offers its program to a "captive audience" of existing patients while the defendant offers its program to individuals exclusively seeking weight loss services.  (Doc. 37 at p. 26; Doc. 39 at pp. 7-8).  The defendant cites no evidence to support its characterization of American Family Care's customers. Independent review of the record reveals Johansen did testify American Family Care has offered its weight-loss program to "a lot" of its patients and that existing clients "were keeping [the program] going for a while" after a director of the program separated from the company in 2016 or 2017.  (Doc. 37-2 at pp. 28, 62-64, 69, 130).  However, this is not a sufficient evidentiary basis on which to draw an inference participants in American Family Care's program are drawn exclusively from its pool of existing patients.

5.      **Similarity of Advertising**

The fifth factor looks at each party's method of advertising and the audiences its advertisements reach. *Florida Int'l Univ. Bd. of Trs., Inc.*, 830 F.3d at 1262-63. The methods and audiences need not be identical, but rather, "the standard is whether there is likely to be significant enough overlap in the audience of the advertisements that a possibility of confusion could result." *Id.* at 1262 (internal quotation marks omitted and alteration adopted). "The key question in assessing similarity of advertising media is whether the parties' ads are likely to reach the same audience." *Id.* at 1263.

Here, there simply is insufficient evidence to answer the question. While Johansen offered testimony regarding a variety of ways in which American Family Care advertised its weight loss program approximately 10 years ago, this is not evidence that permits a reasonable inference regarding the ways in which American Family Care has advertised the program since the defendant began using its mark or even the ways in which it may advertise the WTL program in the future. Moreover, while Johansen testified American Family Care has marketed and continues to market its program through search engine optimization, the utility of these efforts is unclear given the website created for the WTL program is inactive and has been so for an indeterminate amount of time and that Johansen expressed uncertainty as to

27

whether the WTL program is referenced on American Family Care's main website.[16]

This leaves Johansen's testimony that American Family Care has marketed and continues to market its program through promotional materials displayed in its clinics. The defendant correctly notes its external marketing efforts and American Family Care's in-clinic marketing efforts are different methods of advertising. However, as noted, the "key question" in analyzing the fifth factor is not necessarily whether the parties' advertising methods are the same but rather when the parties' advertisements are likely to reach the same audience. *See Florida Int'l Univ. Bd. of Trs., Inc.*, 830 F.3d at 1262 (discussed above). While it is conceivable American Family Care's in-clinic promotional materials – and even the direct mailings through which American Family Care *may* have advertised its weight loss program in the more recent past – reach or have reached the same audience as the defendant's mostly external marketing efforts, the plaintiffs have made no effort to show that is the case. Given the overall dearth of evidence regarding the efforts undertaken to

---

[16] Even if American Family Care did have an active online presence for its program, this would not tip the balance in its favor on the fifth factor. *See Tana*, 611 F.3d at 778 (holding "the only similarity in advertising channels used by the parties [was] their maintenance of websites" and "[t]his similarity would dispel rather than cause confusion [] because the websites [were] separate and distinct, suggesting two completely unrelated business entities"); *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1284 (11th Cir. 2020) (holding district court did not err in finding fifth factor neutral because fact that both parties advertised via the Internet "prove[d] little, if anything," about the likelihood consumers would confuse the parties' marks) (quoting 4 MCCARTHY § 24:53:50), *cert. denied sub nom. Sportswear v. Savannah Coll.*, 2021 WL 4507654 (U.S. Oct. 4, 2021).

market the WTL program during the relevant period, the undersigned finds the fifth factor does not weigh in favor of the plaintiffs.  *See Carnival Brand Seafood Co. v. Carnival Brands, Inc.*, 187 F.3d 1307, 1314 (11th Cir. 1999) (finding fifth factor was neutral where "the evidence showed little with respect to advertising by either party in the critical time frame").

### 6.   Defendant's Intent

The sixth factor requires a court to determine whether a defendant "had a conscious intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent in adopting its [mark]."  *Florida Int'l Univ. Bd. of Trs*, 830 F.3d at 1263 (internal quotation marks omitted).  The plaintiffs offer no evidence the defendant had an improper intent in adopting its mark and concede "the infringement does not appear to be intentional."  (Doc. 38 at p. 10).  Moreover, Ellison testified she chose the WTW mark because it was "catchy" and described what her business did and that she had not heard of American Family Care's program before receiving the June 2, 2015 cease-and-desist letter.  (Doc. 8-1 at ¶ 16; Doc. 37-1 at pp. 49, 68-69).  This testimony supports the existence of an "innocent origin" for the defendant's mark.  *See Welding Servs.*, 509 F.3d at 1361 (holding sixth factor did not weigh in favor of the plaintiffs where "[t]he story of how the [defendant's] logo was created by previous owners to harmonize with the

mark of its sister company [was] undisputed and show[ed] an innocent origin for the logo"). Accordingly, the sixth factor does not weigh in favor of the plaintiffs.

### 7. Actual Confusion

Actual confusion "is not necessary to a finding of likelihood of confusion." Nonetheless, the Eleventh Circuit has recognized the seventh factor as "one of the most" important factors – even "the most" important factor – because evidence of actual confusion is the best evidence of a likelihood of confusion. *Florida Int'l Univ. Bd. of Trs.*, 830 F.3d at 1255-56, 1264; *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362 (11th Cir. 2019). "If consumers have been exposed to two allegedly similar trademarks in the marketplace for an adequate period of time and no actual confusion is detected either by survey or in actual reported instances of confusion, that can be powerful indication that the junior trademark does not cause a meaningful likelihood of confusion." *Hard Candy*, 921 F.3d at 1362 (internal quotation marks omitted). The WTL mark and the WTW mark have co-existed in the same market for approximately seven years. During that time, the defendant has spent more than $600,000.00 to promote its weight loss program in that market. Yet there is no evidence a member of the relevant public ever has confused the parties' marks, and the plaintiffs concede this point. (Doc. 37-1 at pp. 68-69; Doc. 37-2 at pp. 118-20; Doc. 37-8 at pp. 8, 11; Doc. 38 at p. 10). Accordingly, the seventh factor decidedly does not weigh in favor of the plaintiffs.

### 8. Overall Balance

The evidence shows the parties offer the same services under marks that reasonably could be viewed as *somewhat* confusingly similar. However, this is where the factors favoring a finding of likelihood of confusion end. The balance of the factors, including the two generally regarded as the most important, do not favor such a finding. The plaintiffs simply have failed to come forward with sufficient evidence to support the likelihood-of-confusion element of their trademark infringement and unfair competition claims, as a consequence of which those claims fail as a matter of law.

## IV. Conclusion

For the foregoing reasons, the defendant's renewed motion for summary judgment (Doc. 37) is due to be granted, and this action is due to be dismissed with prejudice. A separate order will be entered.

**DONE** this 29th day of December, 2021.

Staci G. Cornelius

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE